UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FINSIGHT I LP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. |
| | ) |
| ROBERT SEAVER and | ) |
| JAMES TOGA, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff FinSight I LP ("**FinSight**"), by way of complaint against defendants Robert Seaver ("**Seaver**") and James Toga ("**Toga**"), alleges as follows:

### PARTIES

1. FinSight is a limited partnership organized under the laws of Bermuda, with its registered address at 4th Floor, Williams House, 20 Reid Street, Hamilton HM11, Bermuda.

2. Seaver is a citizen of the Commonwealth of Massachusetts who, upon information and belief, resides at 408 Columbus Avenue, Boston, Massachusetts 02116.

3. Toga is a citizen of the Commonwealth of Massachusetts who, upon information and belief, resides at 7 Old Farm Circle, Wayland, Massachusetts 01778.

**JURISDICTION AND VENUE**

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that FinSight is a citizen of the British overseas territory of Bermuda, Seaver and Toga are citizens of the Commonwealth of Massachusetts, and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), in that Seaver and Toga are residents of the Commonwealth in which this Court is located, and pursuant to 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

**FACTS**

6. In and prior to June 2020, Seaver owned certain shares of stock of Unity Technologies, Inc. ("**Unity**").

7. In and prior to June 2020, Toga owned certain shares of stock of Unity.

8. In and prior to June 2020, Unity was not a publicly traded company.

9. In or around June 2020, Seaver and Toga (together, the "**Sellers**") retained a broker, Setter Capital Inc. (the "**Broker**"), to act as their agent and assist and represent them in connection with the sale and transfer of certain shares of Unity stock.

10. At all relevant times, the Broker acted on behalf of the Sellers and with the Sellers' authority and consent.

11. In or around June 2020, the Broker contacted FinSight about the prospect of Seaver and Toga selling 50,000 shares of Unity stock to FinSight for $29.00 per share.

12. On or about June 15, 2020, the Sellers and FinSight entered into a *Stock Transfer Agreement* (the "**STA**"), pursuant to which the Sellers agreed to sell 50,000 shares of common

stock of Unity (the "**Shares**") to FinSight at a purchase price of $29.00 per share, for an aggregate purchase price of $1,450,000.00 (the "**Purchase Price**").

13. In agreeing to accept the Purchase Price from FinSight in exchange for selling the Shares to FinSight, the Sellers expressly acknowledged in Section 5.7 of the STA that Unity's capital stock could, in the future, appreciate in value substantially as a result of business, market, or other reasons. The Sellers nevertheless acknowledged and agreed that they were giving up the opportunity to sell the Shares at a possible higher price in the future.

14. Under the STA, FinSight, Seaver, and Toga agreed that the closing of the purchase and sale of the Shares was specifically tied to the completion of conditions precedent, and therefore would occur after the satisfaction of certain conditions precedent. One of the conditions precedent under the STA was securing approval from Unity for the transfer of the Shares to FinSight.

15. Section 2.1 of the STA provides:

> Subject to satisfying of Conditions Precedents (as provided in clause 3 hereof), the closing of the sale and purchase of the Transferred Shares shall take place at 10:00 a.m. California time on the date hereof (the "Closing") or as soon as reasonably practicable following satisfaction or waiver (by the applicable party) of the conditions set forth in this Section 2 (other than conditions which can on their terms be satisfied only at Closing), **or at such other time or place as the parties may mutually agree**. The Closing shall take place remotely via the exchange of documents, electronically or otherwise. If the Closing has not taken place within 7 business days of the date specified above, other than due to a breach of this Agreement by Transferor, Transferor shall have the right to terminate this Agreement **immediately** via email without further notice to Transferee.

(Emphasis added).

16. At all relevant times, it was the parties' understanding and mutual agreement that the closing date was specifically tied to the completion of the conditions precedent and therefore would take place after Unity provided its approval of the transfer of the Shares.

17. At all relevant times, it was the parties' understanding and mutual agreement that the phrase "date specified above" in Section 2.1 of the STA referred to the date on which the conditions precedent were satisfied.

18. Following the parties' execution of the STA, the Sellers, individually and through the Broker, sought Unity's approval of the transfer of the Shares to FinSight.

19. By way of example, on June 16, 2020, Seaver emailed Unity to inform Unity that the Sellers had entered into a stock transfer agreement to sell 50,000 shares of stock of Unity to FinSight for $29.00 per share and to inquire about obtaining Unity's approval of the transaction.

20. By June 23, 2020, Unity had not responded to Seaver, so on that date Seaver emailed the Broker to inquire how long it typically took for Unity to respond to inquiries regarding the transfer of shares. In response, the Broker expressly informed both the Sellers and FinSight that, based upon the Broker's prior experience seeking Unity's approval of transactions for the purchase and sale of Unity stock, the timing of Unity's responsiveness varied and that, in the past, it had taken Unity over a week just to respond to an initial email inquiring about Unity's approval of sale of stock. Knowing this, the Sellers decided to proceed with continuing to seek approval from Unity.

21. On June 29, 2020, the Sellers were copied on email communications between the Broker and Unity in which the Broker provided Unity with additional notice that the Sellers had entered into the STA and requested that Unity advise on the next steps required to secure Unity's approval of the sale.

22. On June 29, 2020, Unity requested information from the Sellers and FinSight in order to facilitate Unity's approval of the sale. In response, Toga provided Unity with

information regarding his stock certificates. FinSight also provided responsive information to Unity.

23. Additionally, between the time the STA was executed and the time that Unity approved the transfer of the Shares, the Broker engaged in an ongoing dialogue with Unity in order to obtain Unity's approval of the transfer of the Shares and provided Unity with information and documents in order to facilitate the process of securing Unity's approval of the sale.

24. Between the time the STA was executed and the time that Unity approved the transfer of the Shares, the Broker and FinSight communicated regarding their efforts to seek and secure Unity's approval of the sale.

25. On or about July 21, 2020, Unity notified FinSight that Unity had approved the Sellers' sale of the Shares to FinSight. On that same day, FinSight informed the Broker that Unity had approved the transaction.

26. However, following Unity's approval, the Sellers failed to comply with and satisfy their obligations under the STA.

27. In or prior to August 2020, it was rumored that Unity would be going public in the near future.

28. On August 2, 2020, Seaver informed the Broker and FinSight that the price of the Shares had increased and that he therefore did not intend to honor the terms of the STA. Seaver did so despite the terms of Section 5.7 of the STA, in which he and Toga expressly acknowledged that the price of the Shares could increase and that, by virtue of entering into the STA, they were giving up the opportunity to sell the Shares at a possible higher price in the future.

29. On August 3, 2020, Seaver informed FinSight that the Sellers were terminating the STA pursuant to Section 2.1 of the STA due to the fact that the transaction had not closed within seven days of the execution of the STA. Prior to this, the Sellers had never attempted or purported to assert any termination rights, to the extent they existed, under Section 2.1 of the STA. At this point in time, over 40 days had passed since the execution of the STA.

30. On or about August 24, 2020, Unity filed a registration statement on Form S-1 with the United States Securities Exchange Commission relating to a proposed initial public offering ("**IPO**").

31. Unity conducted its IPO on September 18, 2020. Unity stock is now a publicly traded stock. On October 15, 2020, its stock price closed at $91.43 per share, which is over three times the price per share that the Sellers agreed to in the STA.

32. As of October 15, 2020, the Shares were worth $4,571,500.00, which is over $3,000,000.00 more than what the Sellers would have received under the STA if the Sellers had not breached the STA and had sold the Shares to FinSight for the agreed-upon Purchase Price.

## CAUSES OF ACTION

### COUNT I
### (Breach of Contract)

33. FinSight repeats and realleges, to the extent the same are applicable to this Count, the factual allegations contained in the preceding paragraphs.

34. FinSight and the Sellers entered into the STA, which is and was a valid, binding, and enforceable contract supported by consideration.

35. FinSight performed all necessary obligations under the STA.

36. The conditions precedent in the STA have been satisfied.

37. The Sellers breached the STA by terminating the STA without cause or legal grounds to do so, refusing to honor the terms of the STA, refusing to transfer the Shares to FinSight, refusing to fulfill their obligations in Section 2.2 of the STA, refusing to fulfill their obligation to execute further documents and instruments and to take such further actions necessary to carry out the purposes of the STA, and otherwise failing and refusing to fulfill and comply with their obligations under the STA.

38. As a direct and proximate cause of the Sellers' breaches of the STA, FinSight has been damaged in an amount to be proven at trial, plus pre-judgment interest thereon, together with post-judgment interest, attorneys' fees, and the costs of bringing this action.

## COUNT II
**(Breach of Contract)**

39. FinSight repeats and realleges, to the extent the same are applicable to this Count, the factual allegations contained in the preceding paragraphs.

40. To the extent that Seaver and Toga had or may have had the right to terminate the STA prior to the satisfaction of the conditions precedent therein, including securing Unity's approval of the transaction, Seaver and Toga knew or should have known that Unity would not or could not provide its approval of the transfer of the Shares in an expeditious fashion. Moreover, Seaver and Toga knew or should have known that Unity would not or could not provide such approval within seven business days of the execution of the STA. Seaver and Toga nevertheless decided to proceed with the transaction to sell the Shares to FinSight for $29.00 per share and, accordingly, agreed to modify and/or waive any right to terminate the STA, to the extent that it ever existed, under Section 2.1 of the STA.

41. The Sellers evinced their clear intent to waive and/or modify the termination provision in Section 2.1 of the STA through a course of conduct that included, at the outset, their

failure to invoke the termination provision immediately after seven business days had passed from the date of the execution of the STA.

42. The Sellers further evinced that clear intent through their affirmative efforts to secure Unity's approval of the transfer of the Shares. Following the execution of the STA and following the passage of seven business days therefrom, the Sellers individually and through the Broker, sought to obtain Unity's approval of the transfer of the Shares to FinSight. These efforts to obtain such approval included but were not limited to requesting that Unity provide such approval, providing Unity with information to facilitate Unity's approval of the transfer of the Shares, and engaging in a continuing dialogue with both Unity and FinSight regarding Unity's approval of the transfer of the Shares.

43. FinSight relied on the Sellers' modification and/or waiver to its detriment by expending its time, efforts, and resources in diligently seeking Unity's approval of the transfer of the Shares and by working with the Broker to secure such approval from Unity. FinSight also solicited investment interest from its investors regarding Unity and received enough commitments to fund the investment in Unity.

44. Nevertheless, the Sellers intentionally breached the STA, as modified, for their own financial benefit. The Sellers, who agreed to sell the Shares to FinSight for $29.00 per share for an aggregate Purchase Price of $1,450,000.00, continue to hold title to the Shares, which as of October 15, 2020 were worth $91.43 per share, for a total of $4,571,500.00, over $3,000,000.00 more than the amount that the Sellers would have received from FinSight under the STA, as modified.

45. The Sellers agreed to modify and/or waive any right to terminate the STA, to the extent that it ever existed, under Section 2.1 of the STA and did so with sufficient specificity and directness so as to leave no doubt that they agreed to the modification and/or waiver.

46. FinSight consented to the modification and/or waiver.

47. FinSight relied to its detriment on the modification and/or waiver.

48. The Sellers breached the terms of the modification and/or waiver to the STA, including by terminating the STA, as modified, without cause or legal grounds to do so, refusing to honor the terms of the STA, as modified, refusing to transfer the Shares to FinSight, refusing to fulfill their obligations in Section 2.2 of the STA, as modified, refusing to fulfill their obligation to execute further documents and instruments and to take such further actions necessary to carry out the purposes of the STA, as modified, and failing and refusing to fulfill and comply with their obligations under the STA, as modified.

49. As a direct and proximate cause of the Sellers' breaches of the STA, as modified, FinSight has been damaged in an amount to be proven at trial, plus pre-judgment interest thereon, together with post-judgment interest, attorneys' fees, and the costs of bringing this action.

**COUNT III**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

50. FinSight repeats and realleges, to the extent the same are applicable to this Count, the factual allegations contained in the preceding paragraphs.

51. The STA is and was valid, binding, and enforceable agreement.

52. Section 8.2 of the STA provides that it is governed by the laws of the State of Delaware.

53. The implied covenant of good faith and fair dealing inheres in every contract governed by Delaware law and requires that a party in a contractual relationship refrain from arbitrary or unreasonable conduct that has the effect of preventing a counterparty to a contract from receiving the fruits of the bargain.

54. Under the implied covenant of good faith and fair dealing, the Sellers had an obligation to act in good faith regarding Unity's approval of the transfer of the Shares, an obligation to act in good faith in finalizing the closing of the sale and purchase of the Shares, and an obligation to act in good faith regarding their discretion in executing further documents and instruments and taking such further actions as reasonably necessary to carry out the purposes and intent of the STA including under Section 8.3 of the STA.

55. The Sellers knew or should have known that Unity would not provide its approval of the transfer of the Shares in an expeditious fashion, and, moreover, knew or should have known that Unity would not provide such approval within seven business days of the execution of the STA.

56. Following the execution of the STA and following the passage of seven business days therefrom, the Sellers engaged in affirmative efforts to secure Unity's approval of the transfer of the Shares.

57. Following the execution of the STA and following the passage of seven business days therefrom, FinSight also engaged in affirmative efforts to secure Unity's approval of the transfer of the Shares.

58. However, after Unity provided the Sellers and FinSight with its approval of the transfer of the Shares, Seaver informed the Broker and FinSight that the price of the Shares had increased and that he therefore did not intend to honor the terms of the STA. Seaver did so

despite the terms of Section 5.7 of the STA, in which he and Toga expressly acknowledged that the price of the Shares could increase and that, by virtue of entering into the STA, they were giving up the opportunity to sell the Shares at a possible higher price in the future.

59. Also following Unity's approval of the transfer of the Shares, the Sellers failed to exercise their discretion to execute further documents and instruments and take such further actions as reasonably necessary to carry out the purposes and intent of the STA. In fact, the Sellers unreasonably refused to execute such documentation.

60. Also following Unity's approval of the transfer of the Shares, Seaver informed FinSight that the Sellers were terminating the STA pursuant to Section 2.1 of the STA due to the fact that the transaction had not closed within seven days of the execution of the STA. Prior to his doing so, the Sellers had never asserted or purported to assert any termination rights, to the extent they existed, under Section 2.1 of the STA. However, as the Sellers were well aware, it was not possible for the closing to occur within seven days of the execution of the STA because the parties first had to secure Unity's approval of the transaction prior to the closing. The Sellers, who were intimately involved with the approval process, knew the approval process would take, and did take, more than seven business days, which would, and did, render it impossible for the closing to occur within seven business days from the date of the execution of the STA.

61. Under the implied covenant of good faith and fair dealing, the Sellers, who themselves were seeking Unity's approval, had an obligation to seek Unity's approval of the transfer of the Shares, and thereafter had an obligation to finalize the closing of the sale and purchase of the Shares.

62. The Sellers allowed FinSight to expend time and resources securing Unity's approval, only to turn around and attempt to invoke a termination provision under Section 2.1 of the STA, which Sellers belatedly claimed ran from the date of the execution of the STA, instead of from the date of Unity's approval of the sale of the Shares. Tellingly, they did so after learning that the value of the Shares would increase following the IPO.

63. The Sellers have acted arbitrarily and unreasonably, thereby frustrating the fruits of the bargain that FinSight reasonably expected.

64. The Sellers have acted in bad faith, dishonestly, and with improper motive to destroy or injure FinSight's right to receive the benefits and reasonable expectations under the STA and with a motive to take advantage of the fact that the value of the Shares has increased significantly.

65. As a direct and proximate cause of the Sellers' conduct, FinSight has been damaged in an amount to be proven at trial, plus pre-judgment interest thereon, together with post-judgment interest, attorneys' fees, and the costs of bringing this action.

## COUNT IV
### (Promissory Estoppel)

66. FinSight repeats and realleges, to the extent the same are applicable to this Count, the factual allegations contained in the preceding paragraphs.

67. The Sellers made a promise to modify and/or waive any right to terminate the STA, to the extent that it ever existed, under Section 2.1 of the STA. FinSight consented to the modification and/or waiver.

68. By making such a promise, the Sellers had a reasonable expectation of inducing action on the part of FinSight, namely to induce FinSight to secure Unity's approval of the transfer of the Shares and to cooperate with Unity, the Sellers, and the Broker.

69. FinSight reasonably relied on the Sellers' promise and took action to its own determent, including but not limited to by expending its time, efforts, and resources to secure Unity's approval of the transfer of the Shares. FinSight also solicited investment interest from its investors regarding Unity and received enough commitments to fund the investment in Unity.

70. The Sellers' promise is binding because injustice can be avoided only through enforcement thereof. If the Sellers' promise is not enforced, the Sellers, who agreed to sell the Shares to FinSight for $29.00 per share for an aggregate Purchase Price of $1,450,000.00, stand to gain a windfall, as the Shares were, as of October 15, 2020, worth $91.43 per share, meaning they were worth $4,571,500.00, which is $3,000,000.00 more than the amount that they would have received from FinSight.

71. FinSight, on the other hand, relied to its detriment, and did not reap any benefit from doing so.

72. As a direct and proximate cause of the Sellers' conduct, FinSight has been damaged in an amount to be proven at trial, plus pre-judgment interest thereon, together with post-judgment interest, attorneys' fees, and the costs of bringing this action.

### COUNT V
### (Unjust Enrichment)

73. FinSight repeats and realleges, to the extent the same are applicable to this Count, the factual allegations contained in the preceding paragraphs.

74. The Sellers promised to sell the Shares to FinSight at a Purchase Price of $29.00 per share, for an aggregate purchase price of $1,450,000.00. The Sellers represented that the closing of the sale and purchase of the Shares would occur after Unity had provided its approval the transfer of the Shares to FinSight.

75. The Sellers expressly acknowledged to FinSight that they knew that Unity's capital stock could, in the future, appreciate in value substantially as a result of business, market, or other reasons. The Sellers also acknowledged and agreed that they were giving up the opportunity to sell the Shares at a possible higher price in the future.

76. In reliance on the Sellers' actions and conduct, FinSight expended time, effort, and resources efforts diligently seeking Unity's approval of the transfer of the Shares and by working with the Broker to secure such an approval from Unity. FinSight also solicited investment interest from its investors regarding Unity and received enough commitments to fund the investment in Unity.

77. On or about July 21, 2020, Unity approved the transfer of the Shares to FinSight.

78. The Sellers thereafter refused, without justification, to sell the Shares to FinSight. The Sellers have been unjustly enriched because the Shares were, as of October 15, 2020, worth $91.43 per share, meaning they were worth $4,571,500.00, which is $3,000,000.00 more than the amount that they would have received from FinSight.

79. As a result of the Sellers' conduct, FinSight has been impoverished in that it expended time, effort, and resources—which could have been otherwise spent pursuing other endeavors—with the expectation that it would own the Shares, and now FinSight does not own the Shares.

80. FinSight has no other remedy at law.

81. As a direct and proximate cause of the Sellers' conduct, FinSight has been damaged in an amount to be proven at trial, plus pre-judgment interest thereon, together with post-judgment interest, attorneys' fees, and the costs of bringing this action.

**WHEREFORE**, FinSight demand judgment in its favor and against Seaver and Toga as follows:

    a.    on Count I, awarding damages in favor of FinSight in an amount to be proven at trial, plus pre-judgment interest thereon, together with post-judgment interest, attorneys' fees, and the costs of bringing this action;

    b.    on Count II, awarding damages in favor of FinSight in an amount to be proven at trial, plus pre-judgment interest thereon, together with post-judgment interest, attorneys' fees, and the costs of bringing this action;

    c.    on Count III, awarding damages in favor of FinSight in an amount to be proven at trial, plus pre-judgment interest thereon, together with post-judgment interest, attorneys' fees, and the costs of bringing this action;

    d.    on Count IV, awarding damages in favor of FinSight in an amount to be proven at trial, plus pre-judgment interest thereon, together with post-judgment interest, attorneys' fees, and the costs of bringing this action;

    e.    on Count V, awarding damages in favor of FinSight in an amount to be proven at trial, plus pre-judgment interest thereon, together with post-judgment interest, attorneys' fees, and the costs of bringing this action; and

    f.    granting to FinSight such other and further relief as the Court deems just and proper.

FINSIGHT I LP

By its attorneys,

/s/ Bridgitte E. Mott
Steven C. Reingold (BBO No. 638649)
Bridgitte E. Mott (BBO No. 684770)
SAUL EWING ARNSTEIN & LEHR LLP
131 Dartmouth St., Suite 501
Boston, MA 02116
Tel: (617) 723-3300
Fax: (617) 723-4151
Steven.Reingold@saul.com
Bridgitte.Mott@saul.com

DATED: October 20, 2020